## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KEYNEL KNIGHT**                                         **CIVIL ACTION**

**VERSUS**                                                **NO. 08-4721**

**BURL CAIN, WARDEN**                                     **SECTION "R"(5)**

### REPORT AND RECOMMENDATION

### I.  BACKGROUND

On October 1, 2009, the district court ordered that the above-captioned habeas application filed by petitioner, Keynel Knight, be dismissed as untimely.  (Rec. doc. 12).  Specifically, the court found Knight's writ application to the Louisiana Supreme Court was post-marked on November 14, 2007, one day after the deadline for his application.  As a result, the filing did not toll Knight's one-year prescriptive period under the provisions of 28 U.S.C. §2244(d)(2).[1]

On or about October 22, 2009, Knight filed a motion for certificate of appealability in which he submitted new evidence

---

[1]Section 2244(d)(2) provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  In Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005) the Supreme Court provided that when a state postconviction application is untimely, "that [is] the end of the matter" for purposes of tolling under §2244(d)(2).

reflecting that he placed his writ application for mailing into the hands of a prison official on November 13, 2007.[2] (Rec. doc. 16, Ex. A). Given this new evidence, the court construed Knight's motion as one for reconsideration of the court's prior order dismissing the instant action as untimely, granted said motion, and referred the matter to the undersigned magistrate judge "for further proceedings including the issuance of a report and recommendation." (Rec. docs. 18 and 19).

Pursuant to the district court's referral, the undersigned has reviewed the entire record and determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[3] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

---

[2]In <u>Causey v. Cain</u>, 450 F.3d 601, 603-607 (5th Cir. 2006), it was determined that the "mailbox rule" would be utilized in determining the filing date of state court pleadings for purposes of ascertaining the timeliness of a federal habeas petition. Under this rule, a pleading prepared by a prisoner acting *pro se* is considered to be filed on the date it is delivered to prison officials for mailing. <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995).

[3]Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

## II. **STATE COURT PROCEDURAL BACKGROUND**

Keynel Knight is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On November 20, 2003, Knight was indicted for the second degree murder of Charles Williams. On May 7, 2004, at the conclusion of a multiple-day trial, a twelve-person jury found Knight guilty as charged in Orleans Parish Criminal District Court. On June 2, 2004, the state district court sentenced Knight to life imprisonment without benefit of parole, probation, or suspension of sentence.

On March 23, 2005, pursuant to Knight's appeal, the Louisiana Fourth Circuit Court of Appeal affirmed Knight's conviction and sentence. State v. Knight, 897 So.2d 919, No. 2004-KA-1681 (La. App. 4 Cir. Mar 23, 2005) (unpublished opinion).[4] Thereafter, Knight did not apply for rehearing nor did he seek review with the Louisiana Supreme Court. As such, Knight's conviction became final thirty days later, on April 22, 2005.

On February 21, 2006, Knight attempted to file a post-conviction application with the Orleans Parish Criminal District Court.[5] Receiving no opinion from the Orleans Parish Criminal

---

[4]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 4 of 5.

[5]A copy of Knight's post-conviction application is contained in the State rec., vol. 5 of 5. Knight asserts that he mailed this application to the wrong address, the court having relocated following Hurricane Katrina. However, Knight asserts that he mailed the application to another, proper address, on March 28, 2006. See rec. doc. 4, Knight's supporting memorandum

District Court with respect to his post-conviction application, Knight, on August 21, 2007, filed an application for writ of mandamus with the Louisiana Fourth Circuit Court of Appeal.[6] In response to Knight's writ of mandamus, the Louisiana Fourth Circuit Court of Appeal, on October 12, 2007, denied Knight's post-conviction claim that he received ineffective assistance of counsel. State v. Knight, No. 2007-K-1070 (La. App. 4 Cir. Oct. 12, 2007) (unpublished opinion).[7] Approximately one year later, on October 3, 2008, the Louisiana Supreme Court likewise denied petitioner post-conviction relief. State ex rel. Knight v. State, No. 2008-KH-0113, 992 So.2d 1006 (La. 2008).

## III. FEDERAL HABEAS PETITION

On October 20, 2008, Knight filed the instant federal habeas corpus petition.[8] In his habeas petition, Knight raises the same claim he raised in his state post-conviction application, namely, that he received ineffective assistance of counsel. Pursuant to

---

at pp. 2-3.

[6]A copy of Knight's Application for Writ of Mandamus is contained in the State rec., vol. 5 of 5.

[7]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 5 of 5.

[8]As noted earlier, under the "mailbox rule", the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1564 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Knight dated his signature on the application on October 20, 2008. This date is the earliest date on which Knight could have submitted his habeas application to prison officials for mailing.

the court's order, the State has filed a response (rec. doc. 22) addressing the merits of Knight's petition and Knight has filed a traverse (rec. doc. 23) to the State's response.

## IV.  FACTS[9]

At approximately 3:15 a.m. on September 19, 2003, police officers were called to investigate a murder at 4101 Cadillac Street, Apt. C.  Once there, they found the body of twenty-three-year-old Charles Williams.  An autopsy revealed Williams was killed by a single gunshot wound to his head, which entered behind his left ear and exited the top of his head.  Williams suffered extensive brain damage, and his body was drug free.  The pathologist testified that because Williams' hands were not bagged when the body arrived at the morgue, no testing was done on them. In addition, the pathologist stated that he was not alerted to test to see if Williams had engaged in sexual activity prior to death. Williams' body was clothed only in socks and two shirts when it arrived at the morgue.

Detective Harold Wischan (Det. Wischan) conducted the investigation of Williams' murder.  Det. Wischan stated that when he arrived at Williams' apartment the crime lab was already on the scene.  He saw a bullet hole in the front door frame as he entered. He testified Williams was lying facedown on his bed, wearing only

---

[9]The facts are taken from the Louisiana Fourth Circuit's opinion on direct appeal, State v. Knight, 897 So.2d 919, No. 2004-KA-1681 (La. App. 4 Cir. Mar 23, 2005) (unpublished opinion).

shirts and socks. He stated that on a dresser next to the bed he found an empty condom wrapper, a bottle of lubrication gel, and a jar of petroleum jelly. There was a shell casing on the pillow next to Williams' head, and a bullet was retrieved from the pillow. The bedroom window was open, and the screen was off the window. Det. Wischan further testified that Williams' vehicle was parked in a lot downstairs from the apartment with a shattered passenger side window. Officers also seized a shell casing from the ground next to the car. Inside the vehicle was a cell phone charger but no cell phone was found.

Det. Wischan claimed that by the time he arrived on the scene, the eyewitness to the shooting, Chevez Ricard (Ricard), had been taken to the police station. Det. Wischan later interviewed and took statements from Ricard and Priest Cormier (Cormier), a friend of Williams. Ricard gave Det. Wischan Williams' cell phone number and the records of calls made to and from the phone from midnight on September 18 to midnight on September 20 were obtained. The records revealed that a certain telephone number appeared on the phone log four or five times between 10:00 p.m. on September 18 and 2:00 a.m. on September 19. Based upon these calls, Det. Wischan obtained a photograph of the defendant, Knight, and showed the photograph to Cormier, who identified the photograph. Det. Wischan then compiled a photographic lineup containing Knight's photo and

showed the lineup to Ricard. Ricard immediately chose Knight's photo as that of the person he saw shoot Williams.

Det. Wischan obtained an arrest warrant for Knight, a search warrant for his residence at 233 Crozat Street, and a search warrant for Williams' vehicle. He testified that when he executed the warrant for the Crozat Street residence, Knight was not present, but various items including a single spent shell casing were seized from Knight's bedroom. The State produced a record of 911 calls made in connection with the murder. According to the calls, the suspect in the murder was wearing a red and yellow shirt. Det. Wischan testified that Knight was arrested later that day (September 19), and at that time was wearing a red shirt and black jeans.

Det. Wischan also testified that officers searched Williams' car and took various samples and a CD, but they did not find Williams' cell phone. He stated that no fingerprints found on items in the car matched Knight's prints, and the officers found no fingerprints on the window sill in Williams' bedroom. On cross-examination, Det. Wischan testified that Williams' cell phone log indicated that the last call received on that phone was 11:58 p.m. on September 18, and that a series of calls were received between midnight and 2:00 a.m. on September 19, with more calls made at 3:16, 3:17, and 3:18 a.m. The police never recovered Williams' cell phone.

Records from Williams' cell phone company showed that Williams received calls from 412-9241 at 10:20, 11:08, and 11:58 p.m. on September 18 and again at 12:24 and 1:46 a.m. on September 19. The court took judicial notice that that number from the log was assigned to a telephone at 233 Crozat Street, the residence of Clarissa Knight.

Anna Duggar (Ms. Duggar), a criminalist for N.O.P.D., was qualified as an expert in the fields of latent print identification, serology, and hair and fiber analysis. She testified she processed Williams' 1999 black Pontiac Grand Prix and seized a CD from the car, as well as trace evidence. She testified she collected trace samples from the front passenger seat and took a sample of the upholstery from that seat. Ms. Duggar recovered seventeen latent prints and found six latent prints on the CD. She compared red and black fibers taken from the passenger seat with fibers taken from the red shirt and black jeans Knight was wearing at his arrest. Her testimony was that the black fibers found on the passenger seat had the same microscopic characteristics as fibers taken from Knight's black jeans, and the red fibers found on the passenger seat had the same microscopic characteristics as fibers taken from Knight's red shirt. Ms. Duggar could not determine when the red and black fibers were deposited on the passenger seat, and she admitted that the fibers are quite common.

Officer Kenneth Leary (Off. Leary), qualified as an expert in firearms identification, testified that the bullet retrieved from the pillow on Williams' bed was consistent with 9mm ammunition. He testified that the shell found next to the pillow and the shell found next to Williams' vehicle were fired from the same gun. In addition, he testified that the spent shell seized from Knight's bedroom was also fired from the same gun.

Priest Cormier testified that he was Williams' best friend prior to Williams' death. Cormier admitted having a prior conviction for aggravated battery in 1994. Cormier testified that he met with Williams at a restaurant at approximately 8:15 on the evening prior to the murder, and the two men made arrangements to meet later with some people from out of town to discuss a beauty pageant Williams and Cormier were planning. Cormier testified that Williams called him around 10:30 p.m. and asked for a ride to the meeting. Cormier stated that when he arrived at Williams' house, Williams' roommate, Ricard, asked for a ride to another location. Williams and Ricard went with Cormier. Cormier dropped Ricard off at the corner of Dumaine and N. Broad Streets. Cormier stated that on the way to the meeting, he picked up two other men who also were to attend.

It was Cormier's testimony that Williams received many calls on his cell phone during the course of the evening. After the men concluded their meeting at the Hyatt hotel, Cormier took the other

two men home.  As he was driving Williams home, Williams received yet another call.  Cormier testified that Williams told the person to "be on the porch ... I'm on the way."  Cormier had seen Williams speaking to the same person in the Iberville Project two to three weeks prior to that night.  Cormier described him as very short, weighing 130-140 pounds, sixteen to eighteen years old, with his hair in twists.  Cormier dropped Williams off at his home at approximately 12:30 a.m.  At that time, Williams had his cell phone in his possession.

Cormier identified Knight as the man he and Williams met in the Iberville Project a few weeks prior to the murder.  He stated that he did not know Knight's name and only saw him on that one occasion.  He identified Knight's photograph and told the officers Knight was the man who Williams said was on the cell phone while they were driving home.

Ricard testified that he had been Williams' roommate for approximately nine months prior to the murder.  On the evening before the shooting he asked Williams to drive him to "Kenneth's" house to get his hair twisted.  Williams refused to do so, primarily because Williams planned to meet with a male nicknamed "Money."  When Cormier arrived to take Williams to the meeting, Cormier agreed to drop Ricard off on the way.  Ricard testified that after Cormier dropped him off, he walked a few blocks to Kenneth's house.  When his hair was done, he called Williams to

have Williams pick him up, but Williams did not answer his cell phone. A few of Kenneth's friends drove him home. Ricard testified that as they were driving home, they saw Williams' car. Ricard called Williams and asked him to take him the rest of the way home, but Williams refused, telling him that "the boy [was] in the car." Ricard testified that Williams also told him not to go home, but Ricard returned home nonetheless because he had to study for a test the next day.

When Ricard arrived at home, Williams was not there. Ricard went into his bedroom, closed the door, and read until he fell asleep. Ricard awakened to the sound of the front door to the apartment opening and closing. He then heard Williams' bedroom door open and close. Soon thereafter, Williams entered Ricard's room and informed that he needed some lubrication. Ricard gave Williams a bottle of lotion, and when Williams left he told Ricard not to make any noise because his guest did not know Ricard was there. Ricard testified that soon thereafter Williams returned and asked for more lubrication because of the size of his companion. Ricard gave Williams a jar of petroleum jelly, and Williams offered to let Ricard watch him and the male have sex. Williams then left the room, leaving the doors to both bedrooms open.

Ricard stated that he eventually crawled into Williams' room to watch Williams and his guest. Ricard testified that Williams and the male, whom Ricard later identified as Knight, were on the

bed engaged in foreplay, and then Williams rolled over onto his stomach, with Knight kneeling behind him.  Ricard testified he saw Knight reach up toward Williams' shoulders, and believing Knight was going to grab hold of Williams' shoulders to brace himself to penetrate Williams, Ricard's gaze dropped down on their bodies and away from Williams' shoulders.  Ricard then heard a gunshot and saw a flash.  He testified that when Knight pulled back from Williams, he had a gun in his hand.

Ricard fled the room as Knight pulled up his pants.  He went into the living room and hid behind the television.  He saw Knight come out of Williams' bedroom, wiping his gun on his shirt, and go into the bathroom.  He heard a flush, and Knight emerged.  Ricard heard Knight moving things around, and then Knight came into the living room and tried to leave through the front door.  Knight could not exit, however, because the gate was locked.  Knight closed the door and Ricard jumped out at him to try and wrestle the gun away from him.  The gun fired while they were struggling, and a bullet hit the doorframe.  Ricard testified the clip fell out of the gun, and he was able to get the gun away from Knight.  Ricard yelled at Knight to leave, and Knight ordered him to give him the gun.  Ricard refused to do so, and Knight picked up the clip, opened the door, threw the clip out through the locked gate, and closed the door.  Ricard left the room to find keys to the gate, and when he returned Knight had armed himself with a knife.  Knight put the knife down

and went into Williams' room.  Knight opened the window, knocked out the screen, and sat on the windowsill.  Knight again demanded his gun, and Ricard threw it out of the window.  Knight then jumped out of the window.  Ricard said he saw Knight pick up the gun and the clip.  Fearing Knight would fire at him, Ricard jumped back and then heard a shot.  He testified he looked back outside and saw Knight pulling his arm back out of the passenger window of Williams' car. Knight then ran from the scene.

Ricard testified he yelled to some people downstairs to call the police, and then he went into Williams' room to try to find Williams' cell phone.  Instead, he found the keys to the apartment on the table next to Williams' bed.  He let himself out of the apartment and went downstairs.  A neighbor had called the police, and Ricard got on the phone until officers arrived on the scene. Ricard said he went back inside the apartment with the officers, going to his room to dress while the officers went into Williams' bedroom.  He then accompanied them to the police station where he gave a statement.  In his first statement to the police he omitted the fact that he saw the shooting because he feared he would be blamed for it.  He informed them of all the facts during his second statement six days later.  Ricard testified that he identified Knight from a photographic lineup as the man who shot Williams.  He stated that when the officers showed him the lineup they told him the perpetrator might or might not be in the lineup.

Ricard testified he gave the officers Williams' cell phone number. He told the police that Knight might have taken the cell phone out of Williams' car. He denied that either he or Williams had a gun in the apartment. He testified he did not know what happened to the knife Knight had wielded at him.

The defense called Det. Wischan, who testified that the coroner's office workers bagged Williams' hands at the scene of the murder. He testified he did not know if the coroner's office routinely checked the hands of gunshot victims for gunpowder residue. He also testified that he did not know to look for the knife at the scene because by the time he arrived Ricard had already gone to the police station.

## V. <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it

"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**VI.  ANALYSIS**

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove

that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690.  To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.

**A.  Failure to File Motion to Suppress**

Petitioner argues that counsel was ineffective due to his failure to seek to suppress various items introduced into evidence at trial.  One such item was a "sweat headband" introduced pursuant to the following trial testimony from Detective Wischan.

Q. I'll show you what I'm marking as State's Exhibit No. 23 and ask you whether you can identify that object and where it was located on the scene?

A. This is a black sweat headband. And this was recovered – actually there's a set of metal steps that goes up to the second floor of the victim's – that leaves the victim's apartment. This was on the stairs. It was marked by the Crime Lab. At that time we had no idea if this had any bearing to our case, so it was also photographed, marked for the record and collected.[10]

Knight also complains about the introduction into evidence of a safe seized from his residence pursuant to a search warrant, along with the introduction of the contents of the safe. Again, these items were introduced pursuant to the trial testimony of Detective Wischan.

Q. I'm showing you what I'm marking as State's Exhibit No. 30, and I know you can see it (item too heavy to lift), can you please describe what this item is?

A. This is the digital safe that we recovered from the room, from the bedroom....

Q. At some point, did you open State's Exhibit No. 30?

A. Yes....

Q. And when you opened Exhibit No. 30, what did you recover?

A. Inside of it was miscellaneous objects, baby powder, toothbrush.

---

[10]State rec., vol. 3 of 5, trial transcript at p. 281.

Q. I'm showing you what I'm marking as State's Exhibit No. 31 and ask you if you can identify that.

A. This is the actual contents of the safe, one bottle of Johnson's baby powder, one containe[r] of Dove deodorant, one container of Secret deodorant, one electric toothbrush, one white t-shirt, [and] one white plastic bag....

Q. I'm showing what I'm marking as State's Exhibit No. 32 and ask you if you can identify that exhibit for the ladies and gentlemen of the jury.

A. This is one Sprint cellular phone.

Q. And was that item also recovered from the safe?

A. Yes, ma'am. And the cell phone battery.

Q. Did you ever learn through your investigation the person who owned that cell phone?

A. No.[11]

It is undisputed that the sweatband discovered at the crime scene was in no way linked to Knight and, similarly, the safe and the safe's contents, discovered at Knight's residence, were not linked to the crime. Accordingly, Knight has failed to show how he was prejudiced by counsel's alleged deficiency in failing to attempt to suppress this evidence.

Another item which Knight contends that counsel should have moved to suppress was a spent 9mm shell casing discovered pursuant to a search warrant at Knight's residence, 233 Crozat

---

[11]State rec., vol. 3 of 5, trial transcript at pp. 296-298.

Street.   This evidence was introduced pursuant to the following trial testimony.

> Q.  When you executed the search warrant, Detective, and made entry into Mr. Keynel Knight's room, can you tell us what you obtained?
>
> A.  Certainly, as we entered the bedroom – actually as myself and Det. Lawrence Green entered the bedroom, there was a bed and a dresser.  On the corner of the dresser was one single spent shell casing....
>
> Q.  I'm showing you what I'[ve] marked as State's Exhibit No. 29 and ask you if you can identify the item in that envelope?
>
> A.  This is the actual 9mm Luger spent casing that was recovered from the dresser in Mr. Keynel Knight's bedroom and it was placed on the evidence books by myself.[12]

Pursuant to the testimony of Officer Leary, the spent shell casing discovered in Knight's bedroom was linked to the two spent shell casings discovered at the crime scene, 4101 Cadillac Street.

> Q.  So the two cartridge cases recovered from 4101 Cadillac Street, along with the one casing recovered from 233 Crozat Street, were all fired by one and the same weapon?
>
> A.  Yes, ma'am.[13]

---

[12]State rec., vol. 3 of 5, trial transcript at p. 296.

[13]State rec., vol. 3 of 5, trial transcript at p. 362.

Clearly, contrary to the sweatband, the safe and the safe's contents, the introduction of the spent shell casing linked Knight to the crime. However, Knight has failed to set forth a valid basis upon which the spent shell casing could have been suppressed.

Detective Wischan, prior to searching Knight's residence, properly obtained a search warrant authorizing a search for "firearms and instrumentalities of firearms, including ammunition, parts, components and paperwork showing ownership of any firearms." Said search warrant was properly based upon the fact that the "victim's roommate...observed KEYNEL KNIGHT exit the victim's bedroom armed with a semi-automatic pistol."[14]

The law is clear that an attorney is under no obligation to raise an argument when the chance of success is unlikely. <u>See United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument...cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); <u>Sones v. Hargett</u>, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); <u>Clark v. Collins</u>, 19 F.3d 959, 966

---

[14]State rec., vol. 2 of 5, p. 104.

(5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Based upon the above, the court finds it unlikely that a motion to suppress evidence of the spent shell casing discovered in Knight's bedroom would have been successful. Accordingly, petitioner, by virtue of counsel's failure to file a motion to suppress evidence of the spent shell casing discovered in his bedroom, suffered no prejudice. Therefore, counsel was not unconstitutionally ineffective.

Finally, Knight complains that counsel was ineffective in failing to move to suppress a crime lab report reflecting that a 9mm handgun, which was not the handgun used in the murder at issue, was discovered at Knight's residence. The report was introduced into evidence pursuant to the following testimony from Officer Leary.

> Q. I'll show you what I'm marking as State's Exhibit No. 55 and ask you if you can identify that object for the ladies and gentlemen of the jury?

> A. Yes, this is a copy of the report that I had written on September 29 of 2003 with the results of the evidence placed in front of me.[15]

An examination of the crime lab report reflects a listing of the "specimens" presented for analysis:

> 1. One (1) Hi-Point, model C9, 9mm semi-automatic pistol, serial number P216846 - scene/233 Crozat Street, Apt. C.

---

[15]State rec., vol. 3 of 5, trial transcript at pp. 360-361.

21

2. One (1) fired 9MM cartridge case - scene/4101 Cadillac Street (parking lot).
3. One (1) fired 9MM cartridge case - scene/4101 Cadillac Street (top of pillow on bed).
4. One (1) fired 9MM copper jacketed lead bullet - scene/4101 Cadillac Street (inside of pillow on bed).

Thereafter, the report sets forth the results of the examination of the above-listed specimens:

Examination revealed that specimens 2 and 3 were fired by the same weapon, but not by specimen 1. Specimen 4 is consistent with 9MM ammunition and was not fired from specimen 1. Specimen 1 was test fired and is functional.[16]

According to Knight, even though the report clearly reflects that the 9mm semi-automatic pistol discovered at his residence was not the murder weapon, its discovery "projected petitioner as a '**bad person**'" and "inflamed the jury and prejudiced [his] defense" because it was the same type of weapon with which the victim "was *shot and killed*. [Emphasis original]."[17]

As noted earlier, to satisfy <u>Strickland's</u> prejudice prong, Knight must show that it is reasonably probable that, but for counsel's failure to seek to suppress the above-referenced lab report due to its reference to the fact that a 9mm pistol, the same type of pistol used to murder the victim, was discovered at Knight's

---

[16]State rec., vol. 2 of 5, p. 157.

[17]Rec. doc. 4, Knight's supporting memorandum at p. 7.

residence, "the result of the proceeding would have been different." Id., 466 U.S. at 694.  No such showing has been made.

The evidence offered against Knight was overwhelming.  As the State points out, and the trial transcript verifies, Chevez Ricard, the victim's roommate, identified Knight as the person, immediately following the shooting, who exited the victim's bedroom with a gun in his hand.[18]  A second witness, Priest Cormier, who was with the victim earlier on the night of his murder, testified that he had seen the victim with Knight on a previous occasion, that the victim, on the night of his murder, received several cell phone calls from Knight, and that the victim made plans to meet Knight later that evening.[19]  Further, as set forth above, shell casings, discovered at the murder scene and at Knight's home, came from the same gun, and telephone records verified several calls between the phone at Knight's home and the victim's cell phone in the hours before the shooting.[20]

Based upon the above, the court finds that Knight has failed to show a reasonable probability that if the lab report, with its reference to the 9mm pistol discovered at Knight's residence, had not been introduced into evidence, the result of the pertinent

---

[18]State rec., vol. 4 of 5, trial transcript at pp. 407-408.

[19]State rec., vol. 3 of 5, trial transcript at pp. 377-378.

[20]State rec., vol. 3 of 5, trial transcript at pp. 290-292.

proceedings would have been different. Accordingly, Knight's claim for habeas corpus relief is without merit.

**B.  Failure to Challenge Identity of Perpetrator**

As noted above, two witnesses, Priest Cormier and Chevez Ricard, identified Knight in connection with the murder of the victim, Charles Williams. Knight claims that counsel was ineffective in failing to challenge these identifications.

With respect to Cormier, the trial transcript reflects that Cormier was with the victim on the night he was murdered. Cormier testified that the victim received several calls that night and informed that the calls were from the man who Cormier had seen the victim with a few weeks earlier at the Iberville Project.[21] Following the murder, Cormier was presented with a photograph of Knight and identified him as the person he had seen the victim with at the Iberville Project and, as such, the person who spoke with the victim on the phone several times on the night of the murder.

Knight complains that counsel, prior to trial, should have moved to suppress Cormier's identification of him. Knight notes that Cormier was not well-acquainted with him, having seen him on only one occasion approximately three weeks before the murder. Based upon such a tangential connection, Knight argues that presenting Cormier with only one photograph, rather than a photographic lineup, was unduly suggestive and would have been

---

[21]State rec., vol. 3 of 5, trial transcript at pp. 376-377.

suppressed had counsel properly moved for suppression prior to trial.

A review of the prosecution's direct examination of Cormier shows that defense counsel objected at trial to Cormier's out-of-court identification and provided an explanation as to why he did not earlier move to suppress it.

Q. Did you have an opportunity to speak to the police in this case?

A. I did.

Q. And were you presented with a photograph when you were at the police station after you gave them the description of the person you met in the Iberville?

A. Yes

MR. MEYER [Defense Counsel]:
    Judge, I'm going to move that this not be allowed. My information was initially that this man was going to make a confirmation ID, which means he was just going to confirm the identity of a person he already knew. Now we're hearing from Mr. Cormier he didn't know this person at all. He saw him one time, didn't know a name or anything, didn't really meet him, was just standing on the side. This is not a confirmation ID. This is one picture shown to a prospective witness. The State knows they have to have a line-up in that situation. I'm objecting to this.

THE COURT:
    I'm going to overrule your objection. I'll note Defense's objection.[22]

The suggestive procedure of showing a witness one photograph of a suspect, rather than a six-person photographic lineup, is not

_____

[22]State rec., vol. 3 of 5, trial transcript at pp. 378-379.

*per se* violative of a defendant's due process rights.  <u>U.S. v.</u>
<u>Hefferon</u>, 314 F.3d 211, 217 (5th Cir. 2002), <u>citing</u> <u>Neil v. Biggers</u>,
409 U.S. 188, 193 (1972).  Such an identification process rises to
the level of a due process violation only upon a showing that it
resulted in a substantial likelihood of misidentification.
<u>Hefferon</u>, 314 F.3d at 218-219, <u>citing</u> <u>Manson v. Braithwaite</u>, 432
U.S. 98, 105 (although the identification procedure was suggestive
in that only one photograph was used and no emergency or exigent
circumstance required this type of procedure to be employed, no
substantial likelihood of irreparable misidentification existed
where the identification was made by a trained police officer);
<u>Neil</u>, 409 U.S. at 200 (even if unduly suggestive, the victim's good
record for reliability led the court to find no substantial
likelihood of misidentification); <u>United States v. Merkt</u>, 794 F.2d
950, 957 (5th Cir. 1986) (female photo array was unduly suggestive,
but the witness's identification of the defendant was sufficiently
reliable to outweigh the corruptive effect of the array).

One factor militating against a suggestive identification
process  constituting a due process violation arises in a situation
where the witness knows the suspect.  <u>Hefferon</u>, 314 F.3d at 219.
In this case, as defense counsel explained, it was his understanding
that Cormier, rather than having previously seen Knight on only one
prior occasion, was acquainted with Knight.  Based upon this fact,

counsel's failure to file a motion to suppress Cormier's out-of-court identification prior to trial is understandable.

Alternatively, even if counsel's action, or lack thereof, constituted a deficiency, Knight was not prejudiced by counsel's failure to file a pre-trial motion to suppress Cormier's identification in light of the substantial evidence submitted against Knight. As noted earlier, said evidence included the shell casings discovered at the crime scene and at Knight's residence which were determined to have been fired from the same gun; the victim's cell phone records which reflected numerous calls between the victim and Knight on the night of the murder; and, Chevez Ricard's positive identification of Knight as the man who shot his roommate, Charles Williams.[23]

Knight also argues that Ricard's out-of-court identification of him was unduly suggestive and counsel was ineffective in not seeking to suppress Ricard's identification. The basis of Knight's argument is his claim that the suspect "was described as having 'twists' in his hair" and in the "array of photos" provided to Ricard for identification purposes only Knight's photograph depicted an African-American male with "twists".[24]

A review of the pertinent record, in particular, the trial testimony of Chevez Ricard, reflects that no reference was made to

---

[23]See discussion supra at p. 23.

[24]Rec. doc. 4, Knight's supporting memorandum at p. 10.

27

Ricard's out-of court identification of Knight.  Instead, Chevez
Ricard's testimony reveals that, as a result of events which took
place following the shooting, Ricard got a very good look at the
murderer.  After a shot was fired inside the victim's bedroom,
Ricard saw a man exit the bedroom, wiping off a gun with his shirt
as he traveled to the bathroom.[25]  Thereafter, the suspect attempted
to escape, but was unable to exit via the front door because a
locked gate prevented him from leaving.[26]  Thereafter, the suspect,
almost literally, bumped into Ricard and a struggle for the gun
ensued.[27]  Ricard ultimately wrestled the gun away and the
confrontation between the two, which lasted approximately fifteen
minutes, ended with the suspect escaping through the victim's
bedroom window.[28]  Based upon this prolonged encounter between
Ricard and the suspect, Ricard had no problem identifying the man
he saw leave the victim's bedroom with a gun in his hand, the man
with whom he struggled for control of the murder weapon.

> Q.  Chevez, do you see the person whom you were
> encountering in your house during all the time that you
> were describing the events that were occurring, do you
> see that person in the courtroom today?
>
> A.  Yes, I do.

---

[25]State rec., vol. 4 of 5, trial transcript at pp. 407-408.

[26]State rec., vol. 4 of 5, trial transcript at p. 408.

[27]State rec., vol. 4 of 5, trial transcript at p. 409.

[28]State rec., vol. 4 of 5, trial transcript at pp. 409-414.

Q. Can you please identify him for the ladies and gentlemen of the jury?

A. He's sitting right over there with a teal green shirt on.

Q. Are you absolutely positive that that's the person that was in your house that night?

A. I'm more than positive.[29]

It is clear, based upon the above, that any suggestiveness in connection with Chevez Ricard's out-of-court identification of Knight did not result in a substantial likelihood of misidentification. Hefferon, 314 F.3d at 218-219. Accordingly, Knight suffered no due process violation and his claim for federal habeas corpus relief is without merit.

### C. Failure to Call Witnesses/Allow Knight to Testify

Knight points to the following statements by defense counsel prior to the commencement of trial as evidence of counsel's ineffectiveness:

MR. MEYER:

> Mr. Knight [is] ready for trial, although I want to place on the record that Mr. Knight is charged with second degree murder. The State has offered him today a plea to manslaughter for a negotiated sentence of 30 years. Mr. Knight is just short of 19 years of age.
> I explained to him the consequences of both situations of second degree murder with mandatory life in jail and in Louisiana life is life and the fact that he would do 85 percent of the 30 years, which means he would have a probable release date at the age of 44. I've

---

[29]State rec., vol. 4 of 5, trial transcript at p. 415.

> given him an opportunity to speak with his
> brother and sister, but he has refused the
> State's offer.[30]

According to Knight, the above shows that counsel was not prepared to "fight" on his behalf and the half-heartedness of counsel's defense is reflected by his failure to call "the witnesses petitioner told him about" and failure to "put him (Mr. Knight) on the stand".[31]

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002), citing Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001). To show the prejudice required to support an ineffective assistance of counsel claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" Evans, 285 F.3d at 377, quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985).

Knight has clearly failed to satisfy the above-described burden of proof. Knight has neither identified the alleged witnesses who counsel should have called to provide testimony nor has he set forth the testimony which these witnesses would have provided.

---

[30]State rec., vol. 3 of 5, trial transcript at p. 188.

[31]Rec. doc. 4, Knight's supporting memorandum at p. 11.

With regard to Knight's complaint that counsel failed to "put him...on the stand", the law is clear that a criminal defendant has a constitutional right to testify in his own behalf. Swinner v. Cain, 2009 WL 2045983 at *10 (E.D. La. July 13, 2009)(citations omitted). "A habeas petitioner, however, has the burden of proving that he was denied this constitutional right." Id. "'[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand.'" Id. (internal citations omitted). A petitioner's "barebones assertion" to this effect is insufficient to require a hearing or other action on the claim. Barnes v. Cain, 2008 WL 4298462 at *4 (E.D. La. Sept. 16, 2008), quoting Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991). The Fifth Circuit has held that there is "'a strong presumption that counsel's decision not to place [a defendant] on the stand was sound trial strategy.'" Bower v. Quarterman, 497 F.3d 459, 473-74 (5th Cir. 2007), cert. denied, ___ U.S. ____, 128 S.Ct. 2051 (2008), quoting Sayre v. Anderson, 238 F.3d 631, 635) (5th Cir. 2001).

In the instant matter, there is no evidence to prove Knight's claim other than his statement to the effect that defense counsel denied him his constitutional right to offer testimony at trial. "Standing alone, such self-serving statements cannot be allowed to succeed or the criminal judicial process would become unworkable."

<u>Turcios v. Dretke</u>, 2005 WL 3263918 at *6 (S.D. Tex. Nov. 29, 2005),

<u>citing</u> <u>Underwood</u>, 939 F.2d at 475-76.

**D.  Failure to Investigate/Question Missing Evidence**

Knight claims that counsel was ineffective in failing to exploit the discrepancy between Detective Wischan's "follow up" report and the testimony of Dr. William Newman, the pathologist who performed the victim's autopsy.  Knight notes that Detective Wischan's "follow up" report reflects that paper bags were placed "on each of the victim's hands in an attempt to preserve any trace evidence that may have been present on the victim's hands."[32]  Dr. Newman, however, testified that when the victim was presented for an autopsy, his hands were not bagged and, therefore, no examination was performed to check for trace evidence.[33]

Knight theorizes that if the victim's hands were "bagged", then "Det. Wischan had to believe that some sort of trace evidence would be found on them."  From that theory, Knight leaps to the conclusion: "There is a strong possibility that the victim's hands contained traces of evidence that would have exonerated petitioner".[34]

---

[32]Rec. doc. 4, Knight's supporting memorandum at p. 12.

[33]Rec. doc. 4, Knight's supporting memorandum at p. 13.

[34]Rec. doc. 4, Knight's supporting memorandum at p. 13.

Counsel's failure to investigate the discrepancy between Detective Wischan's report reflecting that the victim's hands had been "bagged" and Dr. Newman's testimony that the victim's hands were not "bagged", did not constitute a deficiency on the part of counsel and did not prejudice Knight because the basis for such an investigation rests on the totally unsupported assertion that there is a "strong possibility that the victim's hands contained traces of evidence that would have exonerated petitioner". Accordingly, Knight's argument is without merit.

Knight next asserts that counsel was ineffective in failing to exploit the discrepancy between Dr. Newman's testimony and his autopsy report and in failing to utilize the information contained in the autopsy report to undermine the credibility of the prosecution's prime witness, Chevez Ricard. Specifically, Knight points to Dr. Newman's testimony wherein he states that he did not perform any tests which would indicate whether or not the victim had any recent sexual activity.[35] According to Knight, this testimony contradicts Dr. Newman's autopsy report which reflects that there were no lesions at the anus.[36] Further, Knight submits that the autopsy report, reflecting no lesions at the anus, is contrary to

---

[35]Rec. doc. 4, Knight's supporting memorandum at p. 13.

[36]Rec. doc. 4, Knight's supporting memorandum at p. 14.

Chevez Ricard's testimony that "the victim needed extra lubrication because his guest['s] 'dick is to[o] big.'"[37]

Knight's argument is without merit for the following reasons. First, the fact that the autopsy report reflects that there were no lesions at the anus does not contradict Dr. Newman's testimony that he did not perform a test reflecting whether or not the victim had recently engaged in sexual activity. Observing no lesions in the anus area does not equate to testing for the purpose of determining whether the victim had recently been sexually active. Second, the fact that there were no lesions in the victim's anus area does not mean that, contrary to Ricard's testimony, the victim was not recently penetrated in the anus by a large penis. Such penetration does not necessarily result in the formation of lesions in the anus area. Thus, because the autopsy report's finding of "no lesions at the anus", does not run counter to either Dr. Newman's testimony or Chevez Ricard's testimony, counsel was not ineffective in failing to utilize the report for purposes of challenging the testimony of these witnesses.

### E. Failure to Subject State's Case to Meaningful Adversarial Testing

Knight argues that counsel failed to subject the prosecution's case to meaningful adversarial testing due to his failure to

---

[37]Rec. doc. 4, Knight's supporting memorandum at p. 14.

properly attack Chevez Ricard's credibility based upon the two different versions of events which Ricard provided to police and based upon counsel's failure to implicate Ricard as the person who murdered the victim. A review of the trial transcript reflects that Knight's arguments are without merit.

First, a review of Ricard's direct examination reflects that the jury was fully apprised of the fact that Ricard provided two different versions of events to police officials. Ricard testified that he was not truthful when he first relayed to police what he had seen on the night of the murder. Ricard stated that he did not initially inform police that he actually witnessed the murder because he was afraid the police would think he had "something to do with the murder".[38]

A review of defense counsel's cross-examination of Ricard reflects that counsel had Ricard reiterate, for the jury's benefit, that he had not initially been honest with police.[39] Further, defense counsel elicited testimony indicating that Ricard, on the night of the murder, was not happy with the victim. Specifically, counsel got Ricard to admit that because the victim was bringing a "guest" to the house, the victim had told Ricard not to come home. Additionally, counsel elicited testimony from Ricard indicating that

---

[38]State rec., vol. 4 of 5, trial transcript at pp. 419-420.

[39]State rec., vol. 4 of 5, trial transcript at p. 440.

there was a bit of a rivalry between Ricard and the victim with regard to who could get the "cutest" sexual partners, implying that Ricard was jealous because the victim, on the night of the murder, had procured a young, sexual partner while Ricard had not.[40]

Next, Knight argues that "[t]here was no physical evidence linking [him] to this crime."[41] Knight discounts the fact that shell casings found at the murder scene and a shell casing found in his bedroom were determined to have come from the same gun based upon the fact that the shell casing found in his bedroom was not tested until approximately seven months after it was discovered. Knight complains: "Defense counsel never once questioned, 'Why was the shell casing tested seven (7) months after its seizure?'".[42]

The fact that the pertinent testing was performed seven months after the evidence was seized in no way nullifies the finding that shell casings at the murder scene and a shell casing in Knight's bedroom were fired from the same gun. Clearly, there was physical evidence tying Knight to the murder and the fact that counsel did not challenge the testing because it was not performed until seven months after the evidence was seized did not render counsel ineffective. Such a challenge would have been frivolous.

---

[40]State rec., vol. 4 of 5, trial transcript at pp. 437-439.

[41]Rec. doc. 4, Knight's supporting memorandum at p. 17.

[42]Rec. doc. 4, Knight's supporting memorandum at p. 17.

Finally, in support of his theory that Ricard was the actual murderer, Knight points to Dr. Newman's testimony to the effect that there were no powder burns on the victim's scalp and, as such, the bullet could not have been fired by a gun placed right next to the victim's head, as suggested by Ricard's account of events. Specifically, Dr. Newman testified: "I didn't see gun powder marks on the entry or the exit wound meaning no gun powder was on the bone itself of the skull. That tells me that more than likely [the gun] was a little away from the scalp itself."[43]

Additionally, Knight asserts that there was no evidence that a shot was fired as a result of an alleged "struggle" between Knight and Ricard,[44] the knife which Knight allegedly threatened Ricard with was never discovered, and no "projectile" from the alleged firing into the victim's car was found. Knight suggests that no such evidence was discovered because, contrary to Ricard's testimony, there was no struggle between Ricard and Knight resulting in the gun being fired, Knight never threatened Ricard with a knife, and Knight never shot a bullet into the victim's car. Knight submits that Ricard lied about these events to offer an explanation

_____

[43]State rec., vol. 3 of 5, trial transcript at p. 250.

[44]According to Knight, Ricard testified that this struggle for the gun between himself and Knight resulted in a shot being fired into the floor. However, a review of Ricard's testimony (trial transcript at p. 409) reflects that Ricard did not indicate where the shot had gone, only that the gun had been fired.

for powder burns which testing would have revealed on Ricard's hands resulting from the fact that he shot the victim.[45]

For the following reasons, Knight's argument is without merit. First, Knight is incorrect with regard to his statement that no evidence of a gun struggle between Knight and Ricard, resulting in the gun being discharged, was discovered. Detective Wischan testified that he observed "a bullet hole...in the door frame of the front door" of the apartment which Ricard shared with the victim.[46]

Second, Knight states that no "projectile" from his alleged firing into the victim's car was discovered. While the bullet itself may not have been discovered, a shell casing was discovered in the parking lot and this shell casing, along with the casing discovered in the victim's bedroom, was found to have been shot by the same weapon that shot the shell casing discovered in Knight's bedroom.

Third, a review of the trial transcript reflects that defense counsel did cast aspersions on Ricard's version of events via his questioning of various witnesses. With regard to Ricard's testimony suggesting that Knight shot the victim from very close range while kneeling behind the victim, defense counsel, via his cross-examination of Dr. Newman, presented the notion for the jury's

---

[45]Rec. doc. 4, Knight's supporting memorandum at pp. 17-21.

[46]State rec., vol. 3 of 5, trial transcript at p. 272.

consideration that Knight, from that position, would awkwardly have had to use his left hand to shoot the gun.[47]  Additionally, defense counsel questioned Detective Wischan with regard to the fact that Wischan found no evidence to support Ricard's testimony that Knight threatened him with a knife.

> Q.  Did he [Ricard] tell you, in fact, that the perpetrator, at some point while he was there, took up a knife?
>
> A.  Yes.
>
> Q.  Was that knife taken into evidence?
>
> A.  No, sir.... [F]rom my knowledge, the knife was never recovered.  I didn't actually see a knife.[48]

Based upon the above, the court finds that Knight has failed to prove that counsel failed to subject the State's case to meaningful adversarial testing.  Accordingly, Knight's application for habeas corpus relief is without merit.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the petition of Keynel Knight for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE.**

---

[47]State rec., vol. 3 of 5, trial transcript at pp. 252-259.

[48]State rec., vol. 4 of 5, trial transcript at pp. 467 and 468.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[49]

New Orleans, Louisiana, this ___3rd___ day of ___August___, 2010.


_ALMA L. CHASEZ_
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[49]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

40